IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ISMAEL VALDIVIA, et al., | : Civil No. 1:23-CV-1157 |
| Plaintiffs, | : |
| v. | : (Chief Magistrate Judge Bloom) |
| OLD DOMINION FREIGHT LINE, INC., et al., | : |
| Defendants. | : |

_____

| | |
|---|---|
| OLD DOMINION FREIGHT LINE, INC., | : Civil No. 1:23-CV-1173 |
| Plaintiff, | : |
| v. | : (Chief Magistrate Judge Bloom) |
| IVS EXPRESS, INC., et al., | : |
| Defendants. | : |

MEMORANDUM OPINION

I. Introduction

This is a consolidated action arising out of a trucking accident that occurred in July of 2021.[1] Pending before the court is a motion to enforce

---

[1] Doc. 1. This matter was consolidated with another case involving the same trucking accident and parties to the plaintiff's lawsuit. *See* Doc. 29.

settlement filed by Defendants Old Dominion Freight Line, LLC ("Old Dominion"), and Ruddock.[2] The undersigned held an evidentiary hearing on this motion on February 10, 2026. After consideration, we will grant the defendants' motion to enforce the settlement.

## II. Background

As we have noted, this matter arises out of a trucking accident that occurred in July of 2021. According to Valdivia, the tractor trailer he was driving blew a tire as he was heading westbound on the Pennsylvania Turnpike, causing him to pull to the shoulder.[3] While he was on the shoulder, he alleges that Ruddock, who was driving a tractor trailer for Old Dominion, crashed into Valdivia's tractor trailer, which resulted in physical injuries to Valdivia.[4] In his complaint, Valdivia asserted claims of negligence and vicarious liability against the defendant companies and Ruddock.[5] According to Old Dominion, Valdivia's tractor trailer stopped

---

[2] Doc. 48. This motion is joined by the remaining defendants, IVS Express, Inc., Markovic Transportation, Inc., and Markovic Freight, Inc. *See* Doc. 53.
[3] *Id.* ¶¶ 10-11.
[4] *Id.* ¶¶ 13-17.
[5] *See* Doc. 1 ¶¶ 25-37.

abruptly and remained partially in the roadway, blocking traffic, which Old Dominion asserts was the cause of the collision.[6]

Valdivia's former counsel, Richard Godshall, testified at the evidentiary hearing in this matter and detailed his involvement in the case.[7] Godshall testified that he received a call from an individual named Jose Hernandez about taking on Valdivia's case roughly 60 days before the statute of limitations was set to expire.[8] From the call, Godshall realized that Hernandez was not an attorney, but after speaking with Hernandez and Valdivia, decided to represent Valdivia.[9] Godshall explained that there appeared to be issues with liability from the start, evidenced by a police report of the incident finding Valdivia at fault and which resulted in criminal charges being filed against Valdivia.[10] There

---

[6] *See* Doc. 1, 1:23-CV-1173.
[7] The undersigned confirmed with Valdivia that he was waiving his attorney-client privilege as to these matters and the discussions regarding the settlement in order for the court to gather the information necessary to make an informed decision on the motion to enforce settlement. *See* Hearing Transcript ("H.T.") at 3-4, 6-7.
[8] H.T. at 7-8.
[9] *Id.*
[10] *Id.* These charges remain pending. *See Commonwealth v. Valdivia*, No. MJ-09304-CR-0000513-2021. Counsel further explained that the police report from the accident concluded Valdivia was under the influence of drugs at the time of the crash. He further testified that there

was also a discussion between Godshall and Valdivia about the nature of the criminal charges, which Godshall explained impacted the value of the case and his decision regarding whether to assert a wage claim.[11] Ultimately, Godshall decided to take the case but explained to Valdivia that he likely would not get the amount of money he was initially seeking given the liability hurdles with the case.[12]

According to Godshall, he and Valdivia discussed the possibility of settling the case beginning in April of 2025.[13] In May, Godshall received an offer from the defense that he believed was a "nonstarter" because it was so low, and as such, did not convey the offer to Valdivia.[14] However, Godshall explained that in August, after several conversations with Valdivia, Valdivia gave him authority to settle the case for an amount that would result in roughly $175,000 to $200,000 in Valdivia's pocket.[15] Godshall testified that he had two telephone conversations with Valdivia

---

was some indication that Valdivia attempted to get rid of drugs in his possession at the hospital following the crash. H.T. at 8-9.

[11] H.T. at 10-11. Godshall testified that he believed bringing a wage claim could open the door to the evidence of the drug charges coming in, which he believed to be problematic.

[12] *Id.* at 11-13.

[13] *Id.* at 13.

[14] *Id.*

[15] *Id.* at 14-15.

on August 28, 2025—the first at 1:30 p.m. lasting for 28 minutes and 35 seconds, and the second at 4:20 p.m. lasting nine minutes and 17 seconds.[16] He explained that, in his view, no one was really happy with the amount but that, given the hurdles with the case, these numbers were the most realistic outcome for Valdivia to receive a substantial sum of money.[17] He further testified that he had his firm look into setting up an annuity for Valdivia to try and help him stretch the funds over a period of time, but that it was ultimately not an option.[18]

Following the second phone call, Godshall sent an email to Valdivia at 4:40 p.m., which memorialized their phone calls and Valdivia's consent to settle the case.[19] Godshall also made an entry in the law firm's case management system on August 28, 2025, at 4:44 p.m., which states:

> ---Attorney Update Note---Numerous calls with client this month to discuss case value and authority. 175-200k net authority to settle, which means we need 400k or more. It is the right number, but the Defendant may balk. If so, we will schedule deps and move forward with damages workup.[20]

---

[16] *Id.* at 17-18; Doc. 56, Ex. A, at 9.
[17] H.T. at 15-16.
[18] *Id.* at 14-15.
[19] *Id.* at 18-19; Doc. 56, Ex. B, at 11.
[20] Doc. 64 at 3, Godshall Ex. 2; H.T. at 19-20.

A second entry into the case management system on August 29, 2025, at 10:18 a.m. states that Godshall "[s]poke w/ DC. 450k resolves the case. She is getting back to me in the next few days, otherwise, we need to proceed with depositions."[21]

Godshall testified that he worked with defense counsel over the next week to come to an agreement on the settlement amount.[22] Ultimately, they reached an agreement on September 5, 2025, to settle the matter for $450,000, which after accounting for the law firm's fees, expenses, and any outstanding liens, netted Valdivia $209,266.30 in his pocket.[23] Godshall memorialized the settlement in his case management system on that same day at 3:29 p.m., noting that it was a "[g]ood settlement. Client on meth at the time of the crash, and happenings of the crash very well disputed."[24] Godshall testified that he attempted to call Valdivia after the settlement but was unable to reach him, and they did not connect until the following Monday, September 8.[25]

---

[21] Doc. 64 at 4, Godshall Ex. 3.
[22] H.T. at 16-17.
[23] *Id.*; Doc. 54-3 at 10.
[24] Doc. 64 at 5, Godshall Ex. 4.
[25] H.T. at 21-22.

Valdivia also testified at the evidentiary hearing, asserting that he never gave Godshall authority to settle the case.[26] He stated that the first time he and Godshall ever talked about a settlement was on August 28, 2025.[27] He further claimed that he never gave Godshall authority to settle the case during the August 28 phone calls.[28] He testified that he immediately disagreed with the contents of Godshall's August 28 email and characterized the email as Godshall "granting himself" the authority to settle.[29] However, despite immediately disagreeing with the contents of the email and the authority to settle the case, Valdivia never voiced his objections to Godshall, either by telephone or in writing.[30] Rather, he conceded during the hearing that he forwarded Godshall's email to Jose Hernandez and to Elizabeth Ponce, his caretaker, to get their opinions.[31]

Three days later, on August 31, Valdivia sent an email to Jose Hernandez, purportedly meant for Godshall, objecting to Godshall's

---

[26] *Id.* at 42.
[27] *Id.* at 43.
[28] *Id.*
[29] *Id.* at 49.
[30] *Id.* at 49-50.
[31] *Id.;* s*ee* Doc. 54-3 at 1. Valdivia's Gmail log indicates that he forwarded Godshall's email to Ponce and Hernandez on August 29, 2025, at 4:06 a.m. and 4:09 a.m., respectively. *See also* Doc. 56, Ex. C., at 13-14.

August 28 email and disclaiming any consent to settle the case.[32] In his email, Valdivia accused Godshall of mishandling his case and indicated he believed his case to be worth millions of dollars.[33] Godshall testified he never received this email.[34] Further, one of Godshall's law partners, Louis Ricciardi, sent a letter to Valdivia that stated "[the firm] had our IT person check our computers and there is no record of you emailing Rich at any time before September 8, 2025."[35]

Ultimately, Godshall and Valdivia connected on a roughly 30-minute telephone call on Monday, September 8, at which time Godshall informed Valdivia of the settlement.[36] Valdivia immediately objected to the settlement at that time and forwarded Godshall the email he sent to Hernandez on August 31.[37] According to Valdivia's hearing testimony,

---

[32] H.T. at 43-49. While Valdivia was adamant that he sent this email to Godshall, he could not provide any objective evidence that he sent the email to Godshall, or that Godshall received the email, prior to the September 5 settlement. The objective evidence indicates that this email was sent only to Jose Hernandez on August 31 and later forwarded to Godshall on September 8, after the settlement had already taken place. *Id.*
[33] H.T. at 21; Doc. 56, Ex. C., at 13.
[34] H.T. at 41.
[35] Doc. 64 at 11, Godshall Ex. 7.
[36] Doc. 56, Ex. A., at 9.
[37] H.T. at 22, 29-30.

he never authorized Godshall to settle for the amount agreed upon, nor would he have agreed to anything without seeing all of the paperwork first.[38] Godshall testified that in his career of practicing law, he never once had a settlement release document signed prior to a client authorizing a settlement amount.[39] Rather, in response to questioning by Valdivia, Godshall explained that typically when the parties agree to an amount, it takes about 10 to 14 days to finalize a release and another 10 to 14 days to execute the documents.[40] He stated that he is typically able to get a client their portion of the settlement funds within 45 to 60 days of the settlement being reached.[41]

Godshall testified that he told Valdivia he never received the email, but that he could present it to the court and argue against the settlement.[42] But because of the accusations Valdivia made against Godshall, Godshall testified that he had Ricciardi take over all

---

[38] *Id.* at 37-38, 42, 51.
[39] *Id.* at 35.
[40] *Id.* at 36.
[41] *Id.* We are constrained to note, primarily for the benefit of the *pro se* plaintiff, that this timeline is consistent with the undersigned's experience in conducting settlement conferences in federal civil cases.
[42] H.T. at 22.

9

communications with Valdivia.[43] After some back and forth, Valdivia still refused to sign the settlement agreement.[44] Ricciardi informed Valdivia that the defendants would likely file a motion to enforce the agreement, and that the firm could assert mistake, *i.e.*, Valdivia sending the email to the wrong person, to argue against enforcing the settlement.[45] Instead of taking that course of action, Valdivia questioned Ricciardi's involvement and continued to insist that he never gave Godshall authority to settle.[46] Ultimately, the law firm withdrew as counsel while noting for Valdivia that they would request that the court give Valdivia time to find new counsel and oppose the motion to enforce settlement.[47]

The motion to enforce settlement was filed on October 21, 2025, by Old Dominion and Ruddock, and later joined by the remaining defendants.[48] Valdivia filed a brief in opposition to the motion on October

---

[43] *Id.* at 22, 34.
[44] *Id.* at 51-52; Doc. 64-1 at 44.
[45] Doc. 64 at 6-8, Godshall Ex. 5.
[46] *Id.* at 9-20, Godshall Exs. 6-8.
[47] *Id.* at 14-21, Godshall Exs. 8-9. *See also* Doc. 52. Counsel filed a brief in opposition to the motion to enforce on Valdivia's behalf to preserve his right to contest the settlement while also withdrawing as counsel due to the breakdown of the attorney-client relationship.
[48] Docs. 48, 53.

10

30, 2025.⁴⁹ The motion is fully briefed and ripe for resolution. After careful consideration, we will grant the motion.

III. Discussion

Motions to enforce settlement agreements are to be considered "under the same standard as a motion for summary judgment: the non-movant's assertions must be treated as true; the non-movant must be given the benefit of the doubt when their assertions conflict with the movant's assertions; and the movant must be entitled to enforcement as a matter of law."⁵⁰ As with motions for summary judgment, "the non-movant must provide evidentiary support for any assertions on which it wishes to rely in opposing a motion to enforce settlement."⁵¹

Where a client challenges counsel's authority to enter into a settlement agreement, the analysis of counsel's authority is governed by state law.⁵² Counsel must have "express actual authority" to settle a

---

⁴⁹ Doc. 52.
⁵⁰ *Dugan v. O'Hara*, 125 F. Supp. 3d 527, 535 (E.D. Pa. 2015) (internal citation and quotation marks omitted).
⁵¹ *Id.*
⁵² *See Williams v. Havens*, No. 4:21-CV-15, 2023 WL 8374737, at *1 n.6 (M.D. Pa. Dec. 4, 2023) ("Pennsylvania substantive law applies to this analysis because 'the settlement of a lawsuit and the relationship between an attorney and his client are areas traditionally governed by state law.'") (internal citations omitted).

client's case.[53] Such authority "must be the result of explicit instructions regarding settlement."[54] If the attorney's authority to settle a case is in question, and authorization "hinges upon a factual issue and credibility determinations[,]" the court should hold a hearing.[55] "[A] Settlement Agreement is still binding, even if it is clear that a party had a change of heart in between the time he agreed to the terms of the settlement and when those terms were reduced to writing."[56]

As we have explained, Valdivia and Godshall both testified at the evidentiary hearing regarding their recollections of what led up to the settlement agreement. After consideration, we find Godshall's testimony credible and conclude that the objective evidence demonstrates that Godshall had express authority to enter into the settlement agreement on Valdivia's behalf.

Valdivia contends that he never gave Godshall authority to settle his case, and he testified to the same. But the objective evidence says

---

[53] *Tiernan v. Devoe*, 923 F.2d 1024, 1035 (3d Cir. 1991).
[54] *Id.* at 1033.
[55] *Garabedian v. Allstates Engineering Co., Div. of Allstates Design & Development Co., Inc.*, 811 F.2d 802, 803 (3d Cir. 1987).
[56] *McCune v. First Judicial Dist. of PA Probation Dep't*, 99 F. Supp. 2d 565, 566 (E.D. Pa. 2000).

otherwise. The call logs support Godshall's testimony that he spoke with Valdivia twice on August 28, 2025. Godshall's follow-up email, which memorializes the conversation between Valdivia and Godshall, along with Godshall's contemporaneous case management notes and Godshall's testimony all indicate that on August 28, 2025, Valdivia gave Godshall authority to settle for an amount that resulted in Valdivia receiving $175,000 to $200,000. Conversely, Valdivia's claim that no authority was provided is belied by the delay in objecting to Godshall's email that memorialized their conversation.

Having been granted express authority to settle the case, there is no evidence that this authority was revoked. Instead of immediately objecting to Godshall's email on August 28 and informing him that he did not wish to settle, Valdivia testified that he forwarded the email to Ponce and Hernandez because he wanted to get their opinions. Further, although he claims to have sent Godshall an email on August 31 objecting to the August 28 email, Valdivia presented no objective evidence to support this assertion. Rather, the objective evidence demonstrates that Valdivia sent an email to Hernandez, not Godshall, on August 31.

This evidence is supported by Godshall's testimony. Godshall testified that on September 8, 2025, after he spoke with Valdivia and learned Valdivia did not want to settle, he informed Valdivia he never received an email from him. But he offered to argue mistake to negate the settlement—*i.e.*, that Valdivia mistakenly sent his objection email to Hernandez, but that the email evinces Valdivia's lack of consent to settle the case. This testimony is further supported by Ricciardi's subsequent emails to Valdivia, which again offered to make the argument to the court that Valdivia's mistake in sending the email to Hernandez should negate the settlement.[57] Rather than discuss this option with the law firm, Valdivia terminated them as his counsel and asked for his case file, insisting that he never gave authority to settle his case and accusing the firm of mishandling his case.[58]

Ultimately, given the objective evidence and testimony received at the hearing, we conclude that credible evidence establishes that Godshall was given express authority to settle Valdivia's case, and that Valdivia did not timely revoke his consent prior to the settlement being reached.

---

[57] Hearing Ex., Godshall 5-8.
[58] *Id.*

As such, the settlement agreement is binding on the parties, and the motion to enforce the settlement will be granted.

## IV. Conclusion

Accordingly, for the foregoing reasons, the defendants' motion to enforce the settlement will be GRANTED.

An appropriate order follows.

Dated: February 24, 2026

*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge
